**IN THE COURT OF**
**COMMON PLEAS FOR THE STATE OF**
**DELAWARE IN AND FOR NEW CASTLE COUNTY**

| | | |
|---|---|---|
| **DANIELLE FREEMAN,** | ) | |
| | ) | |
| Plaintiff/Cross-Defendant | ) | |
| & Appellant/Cross-Appellee, | ) | |
| | ) | |
| v. | ) | **C.A. No. CPU4-16-002251** |
| | ) | |
| **WALTER G. SCOTT,** | ) | |
| | ) | |
| Defendant/Cross-Plaintiff | ) | |
| & Appellee/Cross-Appellant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Danielle Freeman
2913 ½ N. Van Buren St.
Wilmington, DE 19802
*Pro se Appellant*

Donald L. Gouge, Jr., Esq.
800 N. King Street, Ste. 303
Wilmington, DE 19801
*Attorney for Appellee*

**RENNIE, J.**

This is an appeal from the Justice of the Peace Court concerning a debt action. Trial was held on May 8, 2017, and the Court reserved its decision. This is the Court's Final Order after consideration of the pleadings, testimony, and documentary evidence introduced at trial.

## I.   Facts

On July 7, 2015, Patricia Dennis, then case management specialist for Wilmington Housing Authority ("WHA"), approved, Appellant/Cross-Appellee, Danielle Freeman ("Appellant") to rent 735 Warner Street, Wilmington, DE 19805 ("the Property") from, Appellee/Cross-Appellant, Walter G. Scott ("Appellee"), after the Property passed the initial inspection.[1]   On August 1, 2015, WHA entered into a Housing Assistance Payments Contract ("HAP contract") with Appellee on behalf of Appellant and her two children.[2]   The HAP contract ran from August 1, 2015 to August 1, 2016 and stated that WHA would pay $837.00 of the contractual $850.00 monthly rent on Appellant's behalf, unless circumstances required a readjustment of WHA's contribution.   Donna Starkey Ford, Section 8 Chief at WHA, and Appellee both signed the HAP contract.   On August 17, 2015, Appellant and Appellee entered into a rental agreement for the Property which stated that Appellant was responsible for $13.00 in monthly rent and an $850.00 security deposit.[3]   The Porter Center, a non-profit agency, paid $450.00 of the $850.00 security deposit on Appellant's behalf, and Appellee allowed Appellant to move into the Property prior to receiving the remaining $400.00 portion of the security deposit.

---

[1] Plaintiff's Exhibit 5.  Appellee signed a July 29, 2015 letter indicating that he received this approval.  Plaintiff's Exhibit 4.
[2] Defendant's Exhibit 1.
[3] Plaintiff's Exhibit 3; Defendant's Exhibit 4.

On November 16, 2015, Appellant wrote Appellee notifying him of problems with the Property.[4] Appellant's letter alleges there were mold spores in a bathroom's window, a rusting bathroom tub, faulty electrical sockets, and a water leak in the washroom that was causing mold. Appellant threatened to "take action to pursue [her] rights under the terms of [the] lease and any other applicable laws" if the alleged issues were not corrected.[5]

On January 21, 2016, Kathryn H. McGinnes, Housing Choice Voucher Program Coordinator at WHA since 1993, was asked by Appellant to perform an annual inspection of the Property.[6] During her inspection, Ms. McGinnes found minor deficiencies in the Property's front porch windows, front stove burner, kitchen drawers, and refrigerator door.[7] On February 11, 2016, Ms. McGinnes advised Appellee that he had thirty days to correct these minor violations, and she would return to re-inspect the Property on March 10, 2016. Ms. McGinnes testified that she was unable to access the Property on March 10th because no one was present to let her into the Property; however, she noted that the glass had been replaced in the front porch windows. Because she was unable to access the unit, the unit failed re-inspection.

In late January, snow had accumulated on the Property's roof and the roof began to leak into Appellant's kitchen. The leak created a hole in a section of the kitchen's ceiling. It is unclear how long Appellant lived with this hole in the ceiling, but in early February she presented pictures of the damage to Karen Spellman, Deputy Executive Director of WHA. Thereafter, Ms. Spellman made an administrative decision to immediately terminate the HAP contract with Appellee. While Ms. Spellman's directive was shared with WHA employees

---

[4] Plaintiff's Exhibit 7.
[5] *Id.*
[6] Plaintiff's Exhibit 6.
[7] *Id.*

3

Patricia Dennis and Donna Starkey Ford via a conference call, no one at WHA informed Appellee of the HAP contract's termination.[8]

On February 23, 2016, because of the purported termination of the HAP contract, Patricia Dennis issued Appellant a new voucher that would allow her to enter into a new rental agreement.[9] On February 29, 2016, Appellant sent WHA her sixty day notice letter, stating that she was "giving [her] sixty day notice as of [M]arch 1[], 2016 and would be vacating this property by May[] 1st [for] unfit property issues."[10] Nevertheless, in mid-February, Appellee testified that he wrote Ms. McGinnes a "lengthy" email detailing the steps taken to cure the various deficiencies, including the hole in the ceiling. Ms. McGinnes testified that she intended to visit the Property to verify that all the deficiencies were cured. However, in early March, during further communications between Ms. McGinnes and Appellee—but before Ms. McGinnes visited the Property—Appellee was verbally informed by Ms. McGinnes that the HAP contract had been terminated. Appellee expressed confusion upon hearing this news since Appellant's furniture was still at the Property when he arrived in late February to correct the deficiencies. Ms. McGinnes was surprised that Appellant had not vacated the Property when the HAP contract was terminated. According to WHA policy, a termination of a HAP contract divests a tenant of her right to remain in the dwelling.

Notwithstanding the oral notification of termination, Ms. McGinnes informed Appellee that WHA would continue to make monthly payments as long as Appellant remained at the

---

[8] Ms. Spellman's decision to immediately terminate the HAP contract directly contravened WHA procedure which requires a termination by WHA to be for cause. The WHA allows a landlord to correct minor deficiencies in the rental property before terminating, allows an inspector to deem the deficiencies major and terminate the HAP contract, or allows the tenant to give sixty day notice of a tenant's intention to terminate her rental agreement with the landlord. Ms. Spellman's failure to notify Appellee of the HAP contract's termination circumvented WHA policy because notice is required prior to a non-automatic termination of a HAP contract. Defendant's Exhibit 1.

[9] Plaintiff's Exhibit 8.

[10] On February 8, 2017, Ms. Ford replied to Appellant, per Appellant's inquiry, that WHA had received Appellant's sixty day notice back in February 2016. Ms. Ford further indicated that WHA interpreted the notice as advising WHA that Appellant would vacate the Property by May 1, 2016. Plaintiff's Exhibit 1.

Property. She, however, noted that these payments were contingent on Appellee producing proof to WHA that he had repaired the hole in the Property's kitchen. After Appellee produced proof that he had repaired the Property's kitchen, WHA paid $837.00 towards Appellant's rent for February 2016 and continued to pay the readjusted rate of $608.00 for March, April, and May 2016.[11] On April 5, 2016, Appellee mailed Appellant a letter detailing Appellant's unpaid rent of $897.00 for February, March, and April, and her overdue $400.00 portion of the security deposit.[12] Appellant vacated the Property on May 1, 2016, informing Appellee that she had left the keys under the Property's welcome mat.[13] After cleaning and preparing the Property for a new tenant, Appellee was able to re-let the Property on July 1, 2016.

## II.    Standard of Review

As trier of fact, the Court is the sole judge of the credibility for each fact witness and any other documents submitted to the Court for consideration.[14] If the Court finds that the evidence presented at trial contains conflicts, it is the Court's duty to reconcile these conflicts—if reasonably possible—in order to find congruity.[15] If the Court is unable to harmonize the conflicting testimony, then the Court must determine which portions of the testimony deserve more weight in its final judgment.[16] In ruling, the Court may consider the witnesses' demeanor, the fairness and descriptiveness of their testimony, their ability to personally witness or know the facts about which they testify, and any biases or interests they may have concerning the nature of the case.[17]

---

[11] Plaintiff's Exhibit 1; Defendant's Exhibit 2.

[12] Defendant's Exhibit 5. Appellant stated at trial that she never received Appellant's letter.

[13] Plaintiff's Exhibit 2.

[14] See Nat'l Grange Mut. Ins. Co. v. Nelson F. Davis, Jr., et. al., 2000 WL 33275030, at *4 (Del. Com. Pl. Feb. 9, 2000).

[15] See id.

[16] See id.

[17] See State v. Westfall, 2008 WL 2855030, at *3 (Del. Com. Pl. Apr. 22, 2008).

5

In civil actions, the burden of proof is by a preponderance of the evidence.[18] "The side on which the greater weight of the evidence is found is the side on which the preponderance of the evidence exists."[19]

### III.    The Parties' Contentions

Appellant alleges she paid her $400.00 portion of the security deposit to Appellee in cash and, thus, seeks the return of her security deposit. Appellee, as Cross-Appellant, claims that Appellant neither paid her portion of the security deposit, nor her rental portion for February through June. He was able to re-let the Property in July so he is not seeking rent for July. Appellee also claims that Appellant owes him for an unpaid water bill and damage to the Property beyond normal wear and tear. Appellee seeks $1,589.00 in unpaid rent, which includes $13.00 for February's rent; $242.00 per month for March, April, and May 2016; $850.00 for June 2016; $85.20 for the unpaid water bill; and $700.00 for damage to the Property.

### IV.    Discussion

Preliminarily, the Court notes that Appellant's main assertion concerns the return of a portion of the security deposit. However, the contractual relationship between the parties will be addressed first, given the co-dependency of the two contracts at issue here.

#### A. The Termination of the HAP Contract

WHA failed to properly terminate the HAP contract. The HAP contract at issue is an agreement between a public housing agency ("PHA"), WHA, and a landlord, Appellee.[20] The contract is comprised of three sections: (A) Contract Information, (B) Body of the contract, and (C) the Tenancy addendum.[21] Section (A) describes the rental agreement reached by the parties,

---

[18] *See Gregory v. Frazer,* 2010 WL 4262030, at *1 (Del. Com. Pl. Oct. 8, 2010).

[19] *See Reynolds v. Reynolds,* 237 A.2d 708, 711 (Del. 1967).

[20] Defendant's Exhibit 1.

[21] *Id.*

6

such as the lease term and rent owed by the PHA. This section of the contract is signed by Donna Starkey Ford of WHA and Appellee. Section (B) designates the legal rights and duties between the PHA and the landlord. Specifically, the section allows for the HAP contract to be terminated by the PHA if it "determines that the unit does not meet all requirements of [] [HUD's Housing Quality Standards],[22] or determines that the owner has otherwise breached the HAP contract."[23]

The HAP contract further states: "[i]f the PHA determines that a breach [by the landlord] has occurred, the PHA may exercise any of its rights and remedies under the HAP contract, or any other available rights and remedies for such breach."[24] Thus, the PHA is given wide latitude to act, but the HAP contract is clear that the "PHA shall notify the owner of such determination, including a brief statement of the reasons for the determination."[25] The HAP contract clarifies that the "notice by the PHA to the owner may require the owner to take corrective action, as verified or determined by the PHA, by a deadline prescribed in the notice."[26] The contract allows the PHA to terminate the HAP contract if the landlord does not comply.[27] This section requires all notices from the PHA to the landlord regarding duties or obligations under the HAP contract to be in *writing*. Section (B) concludes by stating, "The HAP contract contains the entire agreement between the owner and the PHA."[28] Section (C), the tenancy addendum, governs the parameters of the rental agreement, and it states: "[i]f there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy

---

[22] The Housing Quality Standards are promulgated by The Department of Housing and Urban Development and can be found at 24 C.F.R. § 982.401 (2015). The standards are quite exhaustive and detail criteria ranging from "Sanitary facilities" to "Smoke detectors." § 982.401(a)(ii)(A)-(M).
[23] Defendant's Exhibit 1.
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.*

7

addendum shall control."[29]    Notably, this section states, under "Lease: Relation to HAP Contract," "[i]f the HAP contract terminates for any reason, the lease terminates automatically."[30]

The rental agreement at issue here is a contract between Appellant and Appellee as tenant and landlord, respectively. The contract is comprised of three parts: (A) Lease information, (B) a second Tenancy addendum, and (C) Additional lease provisions.[31]    The rental agreement contains the same lease information as the HAP contract, an identical Tenancy addendum, and a piecemeal of important Landlord and tenant obligations.[32]

Based on the testimony and documentary evidence, there is no dispute that a valid contract existed between WHA and Appellee in the form of the HAP contract, and a valid contract existed between Appellant and Appellee in the form of the rental agreement. Ms. Spellman's directive to terminate the HAP contract mid-February 2016 would have terminated the rental agreement between Appellant and Appellee; however, WHA never formally notified Appellee that the HAP contract was terminated. Ms. McGinnes, in early March, verbally informed Appellee that the HAP contract had been terminated, but Appellee was not notified in writing, as required by the HAP contract. In addition, WHA continued making payments to Appellee towards Appellant's rent. Hence, because proper notice of termination was not given to Appellee, the HAP contract was not terminated. Consequently, the rental agreement remained valid.

---

[29] *Id.*
[30] *Id.*
[31] Plaintiff's Exhibit 3; Defendant's Exhibit 4.
[32] Neither party provided the Court with the rental agreement's Tenancy addendum; however, the HAP contract notes that the rental agreement's Tenancy addendum is a duplicate of the HAP contract's Tenancy addendum. *See* Defendant's Exhibit 1.

8

This Court bases its determination on the HAP contract's unambiguous language and consistent testimony during trial by multiple witnesses that no WHA employee formally informed Appellee in writing of the HAP contract's termination. The Court is certainly sympathetic to Appellant and the miscues that she received from WHA; however, WHA's failure to follow its procedures cannot be placed at the feet of Appellee. Therefore, the Court finds that the lease did not terminate in mid-February when Ms. Spellman informally directed that the HAP contract be terminated. Instead, the HAP contract continued to run. And concomitantly, the rental agreement remained in effect.

## B. Appellant's Obligations as Tenant

Under Delaware law, a contract has been defined "as an agreement upon sufficient consideration to do or not to do a particular thing."[33] To prevail on a claim for breach of contract, the plaintiff must establish by a preponderance of the evidence that: (1) a contract existed between the parties; (2) the defendant breached his obligation imposed by the contract, and (3) plaintiff suffered damages as a result of the defendant's breach.[34] "A breach of contract occurs by a party's non-performance, repudiation, or both."[35] Additionally, for the injured party's remaining obligations under the contract to cease, the breach must be "material."[36] The breach will be deemed material if it concerns the "'root' or 'essence' of the agreement between the parties, or [is] 'one which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract.'"[37]

---

[33] *Howlett v. Zawora*, 2012 WL 1205103, at *2 (Del. Com. Pl. Mar. 30, 2012) (citing *Rash v. Equitable Trust Co.*, 159 A. 839, 840 (Del. Super. 1931)).
[34] *See VLIW Technology, LLC v. Hewlett-Packard, Co.*, 840 A.2d 606, 612 (Del. 2003).
[35] *Preferred Fin. Servs., Inc. v. Bus. Builders for Entrepreneurs, LLC*, 2016 WL 4537759, at *3 (Del. Com. Pl. Aug. 30, 2016).
[36] *See id.*
[37] *2009 Caiola Family Trust v. PWA, LLC*, 2015 WL 6007596, at *18 (Del. Ch. Oct. 14, 2015).

## 1. The Security Deposit

Both the HAP contract and rental agreement expressly state that an $850.00 security deposit is due to Appellee. According to Title 25, the landlord and tenant are required to "agree to the consideration for rent," and the landlord is allowed to require a security deposit payment equal to one month's rent where the rental agreement is for one year.[38] The security deposit is placed in an escrow account, and can be applied to any property damage by the tenant beyond normal wear and tear, to reimburse the landlord for unpaid rent, or to reimburse the landlord for "reasonable expenses" incurred in renovating and re-letting the premises because of the premature termination by the tenant.[39]

The Court finds that Appellant has failed to satisfy her burden of proving that she handed Appellee $400.00 in cash to satisfy her portion of the $850.00 security deposit.[40] The Court was not persuaded by her testimony. She failed to provide the Court with specifics regarding the circumstances of the payment. In addition, no other evidence or testimony was introduced at trial that supported her version of events. Simply put, her bare assertion that she paid the remaining $400.00 in cash, without obtaining a receipt, does not satisfy the preponderance standard.

Conversely, Appellee, as Cross-Appellant, has satisfied his burden that Appellant owes him $400.00 for the security deposit. His testimony was descriptive, detailed, and he submitted evidence that supported his version of events. Hence, the Court finds that Appellant owes Appellee $400.00 as a security deposit. The posture of this case makes the award of a security deposit potentially problematic since the security deposit here is a refundable deposit. In other

---

[38] 25 *Del. C.* § 5501(a); 25 *Del. C.* § 5514(a).

[39] 25 *Del. C.* § 5514(b).

[40] Four hundred and fifty dollars of the security deposit was paid to Appellee on Appellant's behalf by a non-profit agency.

words, while Appellee is entitled to the $400.00 security deposit portion, if Appellant had originally paid Appellee her portion of the security deposit, he would have been required to apply that $400.00 to Appellant's overdue rent. Appellant would have then owed less in overdue rent.[41] However, in the present case, Appellant failed to pay Appellee her $400.00 portion. Therefore, to avoid granting Appellee a windfall, the Court will subsume the security deposit into any unpaid rental damages that Appellant owes to Appellee.[42] That is, instead of requiring two separate "exchanges" that include Appellant paying Appellee her portion of the security deposit and the remaining overdue rent that she owes after the $400.00 is subtracted from any rental damage award Appellee recieves, the Court will neither subtract nor add the $400.00 portion to any rental damages Appellee is awarded in this case.

### 2. Rental Payments

Appellant breached the contract when she failed to make rental payments for the remainder of her lease's term. If the tenant fails to pay rent when the rent is due, and the landlord demands payment within five days of tenant's default, the landlord may terminate the rental agreement if the tenant fails to make a payment within those five days.[43] If the tenant refuses to satisfy the rent even after the rental agreement has been terminated, then the landlord can bring an action against the tenant for unpaid rent.[44] A tenant is allowed to terminate the rental agreement early with thirty days notice for reasons enumerated under Title 25.[45] However, if the tenant desires to vacate the Property before the end of the rental term, the tenant must give the landlord sixty days notice of her intent to vacate.[46]

---

[41] 25 *Del. C.* § 5514(c)(2).
[42] *See Crandle v. Wilson*, 2011 WL 13175121, at *3 (Del. Com. Pl. July 29, 2011) (applying the security deposit to the unpaid rent which defendants owed to plaintiff).
[43] 25 *Del. C.* § 5502(a).
[44] *See id.*
[45] 25 *Del. C.* § 5314(b).
[46] 25 *Del. C.* § 5106(c).

The Court notes that while Appellee was not formally notified of the HAP contract's termination, Appellee was placed on notice that he would need to seek another tenant for the Property in May 2016. Under Delaware law, if feasible, a party is obligated to mitigate damages.[47] "[A] party cannot recover damages for loss that he could have avoided by reasonable efforts."[48] In other words, "the injured party has a duty to minimize . . . its costs and losses."[49] Under the circumstances in the present case, Appellee's need to mitigate damages was objectively apparent when Appellant indicated in her February 29th letter that she would vacate the Property on May 1st. In addition, WHA's statements that the HAP contract was terminated and it would cease making payments when Appellant no longer resided at the Property should have expedited mitigation efforts. This is especially true since Appellee knew, or should have known, that the HAP contract provides that the lease is automatically terminated once the HAP contract terminates. As the holder of the burden of proof on this issue, Appellee failed to introduce any proof of his mitigation efforts. Thus, Appellant is not responsible for Appellee's failure to mitigate damages prior to July 1, 2016. In addition, the Court finds that Appellant made her $13.00 payment to Appellee for her portion of February's rent;[50] therefore, she is only liable for the $242.00 monthly payments for March, April, and May 2016—totaling $726.00.

### 3. Trash Removal & Property Damage

Appellee, as Cross-Appellant, has failed to prove by a preponderance of the evidence that Appellant owes $85.20 for the unpaid water bill and $675.00 for damage to the Property. Appellee testified during trial that he had a verbal agreement with Appellant that she would not

---

[47] 25 *Del. C.* § 5507(d)(2); *see also John Petroleum, Inc. v. Parks*, 2010 WL 3103391, at *6 (Del. Super. June 4, 2010).

[48] *John Petroleum, Inc.*, 2010 WL 3103391, at *6 (internal quotation marks omitted) (citing *West Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2009 WL 458779, at *4 (Del. Ch. Feb. 23, 2009)).

[49] *Id.*

[50] Plaintiff's Exhibit 9.

12

be required to pay for water. He noted that water overages were not usually a problem for the Property and, thus, he had previously covered the added cost for his tenants. He further stated he now felt that Appellant should pay for her portion of the water bill because of the continuous attention he expended on her rental unit. Appellee did not articulate this change in position to Appellant. Since Appellee's intention to charge Appellant was formed after the Landlord-Tenant relationship began, the Court finds this stipulation was not part of the original agreement.

Further, Appellee submitted six pictures into evidence; two pictures of the Property's trash-filled basement, one picture of a circular indent in an interior door, two pictures of the Property's open refrigerator, and one picture of crayon drawings on an interior wall.[51] Appellee testified that four of the six pictures were taken on May 1st and the remaining two pictures of the open refrigerator were taken a few days later. Appellee testified that he paid an individual a total of $675.00 to repair and clean the Property; however, he failed to provide sufficient detail at trial to support his burden. He did not name the individual and failed to provide the Court with any receipts from the transaction.[52] Appellee also failed to provide an itemized list of the damages and the cost to repair each. Because Appellee's damage request includes damages for normal wear and tear, the Court is unwilling to speculate and award an arbitrary figure.[53]

The Court finds that Appellee has proven that Appellant owes $25.00 for special trash removal services which Appellee paid to dispose of trash he found in the basement after Appellant vacated the Property. The tenant is obligated under Title 25 to keep the rental unit "clean and safe," and to "[d]ispose from the rental unit all ashes, rubbish, garbage and other

---

[51] Defendant's Exhibit 6.

[52] Appellee only submitted a June 4, 2016 check for $450.00 and a July 10, 2016 check for $225.00 to support his property damage figure. Defendant's Exhibit 7.

[53] *See Lucas v. Stephens*, 2017 WL 1497881, at *3 & n.17 (Del. Com. Pl. Apr. 26, 2017) (Rennie, J.) (citing *Stoltz Mgmt. Co. v. Consumer Affairs Bd.*, 616 A.2d 1205, 1208-10 (Del. 1992)).

organic or flammable waste, in a clean and safe manner."[54] Appellee's submitted transaction history and testimony satisfy his burden for this damage amount.[55]

## V. Conclusion

After weighing the evidence and witness credibility, this Court finds that Appellant has failed to satisfy her burden and prove by a preponderance of the evidence that she is entitled to a $400.00 return of her security deposit. This Court also finds that Appellee, as Cross-Appellant, has proven by a preponderance of the evidence that he is entitled to $751.00, which includes unpaid rent in the amount of $242.00 for Appellant's portion of the monthly rent for March, April, and May 2016, and $25.00 for special trash removal services. Therefore, the Court hereby enters judgment and awards Appellee, as Cross-Appellant, $751.00, plus pre- and post-judgment interest at the legal interest rate according to 6 *Del. C.* § 2301, *et seq.*[56]

**IT IS SO ORDERED** this 19th day of June, 2017.

Sheldon K. Rennie,
Judge

cc:     Ms. Tamu White, Chief Civil Clerk

---

[54] 25 *Del. C.* § 5503(2)-(3).
[55] Defendant's Exhibit 8; *see Stoltz Mgmt. Co. v. Consumer Affairs Bd.*, 616 A.2d 1205, 1209 (Del. 1992).
[56] Appellee moved for a Directed Verdict at the close of Appellant's case-in-chief; however, the Court will not address this motion as this decision renders the motion moot.